UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 23-10360-GAO

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY and
PEAK UTILITY SERVICES GROUP, INC. LIFE BENEFIT PLAN,
Plaintiffs,

v.

ARETHA BONDS and CARSHANA GRAHAM,
Defendants.

ORDER ADOPTING REPORT AND RECOMMENDATION
February 12, 2025

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has recommended that Carshana Graham's Motion for Summary Judgment (dkt. no. 73) be granted. No timely objections have been received. After carefully reviewing the pleadings, the parties' submissions, and the Report and Recommendation (dkt. no. 83), I agree with the magistrate judge's analysis and conclusions.

Accordingly, I ADOPT the magistrate judge's recommendation and GRANT Graham's Motion for Summary Judgment. The Clerk of the Court is directed to distribute the amount of $100,572.60 deposited into the Court Registry Investment System account, plus all interest earned thereon, by the issuance of a check made out to Carshana Graham.

It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY AND PEAK UTILITY SERVICES GROUP, INC. LIFE BENEFIT PLAN,<br><br>     *Plaintiffs*,<br><br>v.<br><br>ARETHA BONDS AND CARSHANA GRAHAM,<br><br>     *Defendants*. | No. 23-cv-10360-GAO |

ARETHA BONDS,

     *Cross Claimant*,

v.

CARSHANA GRAHAM,

     *Cross Defendant*.

ARETHA BONDS,

     *Counter Claimant*,

v.

THE LINCOLN NATIONAL LIFE INSURANCE COMPANY AND CARSHANA GRAHAM,

     *Counter Defendants*.

**REPORT AND RECOMMENDATION ON CARSHANA GRAHAM'S MOTION FOR SUMMARY JUDGMENT**

LEVENSON, U.S.M.J.

<u>INTRODUCTION</u>

This interpleader action concerns a dispute over the proceeds of a $100,000 life insurance policy, payable upon the death of Elijah J. Pinckney (the "Decedent"). At the time of the Decedent's death, his girlfriend was listed as the primary beneficiary, and his mother was listed as the contingent beneficiary. The Decedent's mother contends that the money should nevertheless be paid to her because, his mother claims, the Decedent's girlfriend engaged in fraud and other wrongdoing. As discussed below, there is insufficient evidence to create a triable question regarding the Decedent's mother's accusations, so I recommend that judgment issue in favor of the Decedent's girlfriend (*i.e.*, the named primary beneficiary).

## I.    **Background**

### A.    *Factual Background*

The insurance coverage at issue arises from a group life insurance policy that Lincoln National Life Insurance Company ("Lincoln") issued to Peak Utility Services Group, Inc. ("Peak Utility"), providing coverage to eligible Peak Utility employees and their named beneficiaries. <u>Docket No. 1</u>, ¶ 10. The Decedent, a Peak Utility employee, had $50,000 in basic group life insurance coverage and $50,000 in accidental death coverage, for a total death benefit of $100,000 payable under the policy in the event of his death. *Id.* ¶ 11.

On January 24, 2021, the Decedent designated his mother, Ms. Aretha Bonds, as the primary beneficiary of the policy. *Id.* ¶ 13; *see* <u>Docket No. 1-5</u>. At the same time, he designated his girlfriend, Ms. Carshana Graham, as the contingent beneficiary.[1] <u>Docket No. 1</u>, ¶ 13; *see* <u>Docket No. 1-5</u>.

---

[1] There is conflicting information in the record as to whether the Decedent and Ms. Graham were ever married. *Compare* <u>Docket No. 1-5</u> (Beneficiary Designation Form listing Ms. Graham as the

*Footnote continues on following page.*

About one year later, on January 1, 2022, Ms. Graham was named the primary beneficiary, and Ms. Bonds was demoted to contingent beneficiary. Docket No. 1, ¶ 14; *see* Docket No. 1-6. Lincoln's records reflect that the beneficiary change was submitted electronically. *See generally* Docket No. 1-6.

On November 9, 2022, the Decedent was murdered. Docket No. 1, ¶ 15; *see* Docket No. 1-7 (death certificate). There is virtually no evidence before the Court regarding the circumstances of his death.

On January 3, 2023, Lincoln received a claim for the insurance proceeds from Ms. Graham. Docket No. 1, ¶ 20; *see* Docket No. 1-8.

On January 10, 2023, Lincoln received a letter from Ms. Bonds claiming that Ms. Graham had fraudulently changed the primary beneficiary to herself and that she should therefore not be paid the insurance proceeds. Docket No. 1, ¶ 19; *see* Docket No. 1-9. Ms. Bonds wrote that Ms. Graham is "not a trustworthy person" because, among other things, she had "refused to give up" the Decedent's personal belongings, forcing Ms. Bonds to involve law enforcement. Docket No. 1-9, at 3.

The Complaint recites that Lincoln could not pay the proceeds to Ms. Bonds due to fear of litigation from Ms. Graham demanding payment under the terms of the policy. Docket No. 1, ¶ 19. It further recites that, because Ms. Graham "ha[d] not been cleared as a suspect in the homicide of

---

Decedent's spouse), *and* Docket No. 1-8 (Beneficiary's Statement listing Ms. Graham as the Decedent's spouse), *with* Docket No. 1-7 (Certificate of Death stating that the Decedent was "never married"), *and* Docket No. 35-2, at 5 (interrogatory response by Ms. Bonds stating that she told a representative of Lincoln that her "son was never married"). It is similarly unclear whether Ms. Graham is the mother of one of the Decedent's two children or neither. *Compare* Docket No. 40, at 1 ("One of [the Decedent's] children is with Ms. Graham the other child is with another woman."), *and* Docket No. 10, ¶ 65 ("Carshana Graham is the mother of only one minor child."), *with* Docket No. 35-2, at 5 ("My son was only dating Carshan Graham for about 2 years more or less and they do not have any children together.").

the Decedent," Lincoln could not pay the proceeds to Ms. Graham without risking litigation from Ms. Bonds. [2] *Id.* ¶ 20. Notably, there is nothing in the Complaint or its attachments to indicate who, if anyone, may have considered Ms. Graham a "suspect," let alone to indicate what basis, if any, there may have been to support such a characterization.

B.    ***Procedural Background***

On February 17, 2023, Lincoln and Peak Utility Services Group, Inc. Life Benefit Plan filed this interpleader action, naming Ms. Bonds and Ms. Graham as defendants. *See generally* <u>Docket No. 1</u>. In so doing, Lincoln and Peak Utility Services Group, Inc. Life Benefit Plan called upon the Court's authority to determine the rightful beneficiary of the policy, claiming that they could not proceed to payment without risking litigation from either Ms. Bonds or Ms. Graham. *See generally id.*

In her answer to the Complaint, Ms. Graham contends that, because she was listed as the primary beneficiary at the time of the Decedent's death, she is entitled to the insurance proceeds. *See generally* <u>Docket No. 11</u>.

Ms. Bonds, by contrast, asserts in her answer that she is the one who is entitled to the insurance proceeds. *See* <u>Docket No. 10</u>, ¶ 55. She should be paid the proceeds, she claims, because Ms. Graham fraudulently designated herself as the primary beneficiary and because Ms. Graham was responsible for the Decedent's death. *See id.* ¶¶ 43–46, 55. Specifically, Ms. Bonds alleges:

43. Upon information and belief Elijah J. Pinckney did not want to remove his Mother Arthea Bonds as the main beneficiary of the policy.

---

[2] It bears noting that, in Ms. Bonds' counterclaim, she asserts that the policy at issue "has clear language that when a beneficiary is the suspect in the intentional/accidental death of the policy holder, that beneficiary shall not receive." <u>Docket No. 10</u>, ¶ 52. I have reviewed the policy (<u>Docket No. 1-4</u>), and I have not identified language to that effect.

44. Upon information and belief, Carshana Graham fraudently changed the beneficiary of the policy to herself through electronic means.

45. Carshana Graham is a suspect in Elijah J. Pinckney murder.

46. Upon information and belief Carshana Graham murdered Elijah J. Pinckney.

*Id.* ¶¶ 43–46. In light of these allegations, Ms. Bonds brought crossclaims against Ms. Graham alleging fraud and liability under Massachusetts' wrongful death statute.[3] *See id.* ¶¶ 58–74.

Judge O'Toole allowed Lincoln to deposit the insurance proceeds and accrued interest with the Court and dismissed Lincoln and Peak Utility Services Group, Inc. Life Benefit Plan from the case. *See* Docket No. 21 (granting Lincoln's motion to deposit the insurance proceeds with the Court); Docket Nos. 26, 27 (dismissing Lincoln and Peak Utility Services Group, Inc. Life Benefit Plan from the action).

With only Ms. Bonds and Ms. Graham remaining, the case proceeded. At a status conference on August 22, 2023, Judge O'Toole ordered the parties to complete fact discovery by March 29, 2024. Docket No. 36.

In the months following Judge O'Toole's order, little discovery was exchanged. Indeed, the parties' discovery efforts have been so deficient as to impact the course of this litigation in several ways, including by introducing substantial delay. Four motions to compel were filed between July 2023 and May 2024, none of which concerned the proper scope of discovery (or anything else of substance); they simply requested that the Court compel the opposing party to provide a response—*any response*—to the moving party's discovery request(s). *See* Docket Nos. 29, 44, 51, 58. Ultimately, these shenanigans led me to order sanctions against Ms. Bonds,

---

[3] Ms. Bonds also brought a breach of contract counterclaim against Lincoln. *See* Docket No. 10, ¶¶ 50–53. The Court has since dismissed the counterclaim. *See* Docket No. 22 (granting Lincoln's motion to dismiss the counterclaim filed by Ms. Bonds against Lincoln).

sanctions that allowed Ms. Graham to draw reasonable inferences from Ms. Bonds' failure to respond to certain interrogatories and to deem as admitted various requests for admission. *See* Docket No. 72. Because it has some impact on the resolution of the present summary judgment motion, I will review, in part, the dismal course of discovery in this case.

On April 4, 2024—several days *after* the fact discovery deadline set by Judge O'Toole—Ms. Graham filed one of the motions to compel, seeking an order directing Ms. Bonds to respond to Ms. Graham's second set of interrogatories.[4] Docket No. 51. Ms. Graham's counsel had apparently served the interrogatories (along with requests for admission) on December 23, 2023. *See* Docket No. 74, at 1. Approximately one month later, on May 6, 2024, Ms. Bonds filed a motion to compel, asking the Court to order Ms. Graham to produce documents responsive to Ms. Bonds' requests for the production of documents and to sit for a deposition.[5] *See* Docket No. 58.

Judge O'Toole referred the case to me for pretrial proceedings, including report and recommendation on dispositive motions. Docket No. 56. On May 7, 2024, I held a hearing on the parties' dueling motions to compel. Docket No. 61. Following the hearing, I denied both motions, based on both parties' failure to comply with Local Rule 7.1(a)(2); neither party's motion

---

[4] In fairness, Ms. Graham had also filed a motion to compel Ms. Bonds to respond to the second set of interrogatories *before* the March 29, 2024, fact discovery deadline (on February 27, 2024). *See* Docket No. 44. However, because Ms. Bonds claimed in her opposition that she never received the interrogatories (*see* Docket No. 46), Judge O'Toole denied the motion. Docket Nos. 48, 49.

I note that Ms. Bonds did respond to Ms. Graham's first set of interrogatories, which were served on May 25, 2023, on July 26, 2023. *See* Docket No. 35, at 1.

[5] It appears that, on February 28, 2024, Ms. Bonds served requests for the production of documents and served a notice of deposition setting Ms. Graham's deposition for March 19, 2024. Docket No. 58, at 1; *see* Docket No. 58-1, at 8–9 (Notice of Deposition), 12–20 (Requests for Production of Documents). On April 26, 2024, counsel for Ms. Graham responded. Docket No. 58, at 1–2; *see* Docket No. 58-1, at 6. Ms. Graham's counsel claimed that the only documents responsive to the document requests were those already produced by Lincoln and that the notice of deposition was defective because it did not identify the deponent and did not contain a Zoom link. Docket No. 58, at 1–2; *see* Docket No. 58-1, at 6.

contained a certification that counsel had "conferred and attempted in good faith to resolve or narrow the issue." *Id.* Nevertheless, I agreed to amend the scheduling order and to reopen fact discovery for two limited purposes: (1) to allow Ms. Bonds to respond to Ms. Graham's second set of interrogatories, and (2) to allow Ms. Bonds to notice Ms. Graham's deposition. *Id.* I ordered Ms. Graham to re-serve the second set of interrogatories that day and ordered Ms. Bonds to respond by May 14, 2024, one week later. *Id.* I also ordered the parties to confer regarding Ms. Graham's deposition, and I directed that the deposition be completed by May 31, 2024. *Id.*

On June 28, 2024, Ms. Graham filed a motion for default judgment claiming that Ms. Bonds had failed to comply with my May 7, 2024, order. *See* Docket No. 65. Ms. Bonds had apparently failed to respond to the second set of interrogatories (and, it seems, never noticed Ms. Graham's deposition), despite having been granted additional time to do so.[6] *See id.* On August 2, 2024, I held a hearing on the motion for default judgment. Docket No. 71. Although I declined to enter judgment on behalf of Ms. Graham, I entered a lesser sanction for Ms. Bonds' failure to comply with my discovery order: I ordered that Ms. Graham "may draw reasonable inferences as to [the unanswered second set of] interrogatories" and may treat as admitted the requests for admission, to which Ms. Bonds failed to respond until months after the discovery deadline. *See* Docket No. 72.

---

[6] This was Ms. Graham's second attempt that month at obtaining judgment in her favor. On June 6, 2024, Ms. Graham filed a motion for "the entry of judgment on her behalf." *See* Docket No. 63. I denied that motion on June 24, 2024, for failure to comply with Local Rule 7.1(a)(2). Docket No. 64.

Shortly thereafter, Ms. Graham filed the motion for summary judgment that is currently before the Court. *See* Docket Nos. 73–75. Ms. Bonds has opposed that motion,[7] *see* <u>Docket No. 77</u>, and Ms. Graham has replied, *see* <u>Docket No. 79</u>. I held a hearing on the summary judgment motion on October 23, 2024. <u>Docket No. 81</u>. Counsel for Ms. Bonds failed to appear. I took the motion under advisement.

## II.    Governing Law

### A.    *Summary Judgment Standard*

Rule 56 of the Federal Rules of Civil Procedure provides that, as to "each claim or defense—or the part of each claim or defense—on which summary judgment is sought," the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(a)</u>. To preclude a grant of summary judgment, a factual dispute must be both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, <u>477 U.S. 242, 247</u>–48 (1986). "A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, <u>877 F.3d 14, 23</u>–24 (1st Ci<u>r. 2017</u>) (quoting *Sánchez v. Alvarado*, <u>101 F.3d 223, 227</u> (1st Ci<u>r. 1996</u>)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, <u>477 U.S. at 248</u>. The Court may also enter summary judgment "against a party who fails to make a showing sufficient to establish the

---

[7] The same day that Ms. Bonds filed her opposition to Ms. Graham's summary judgment motion, she also filed a document titled: "Aretha Bonds Opposition to Carshana Graham's Motion for Sanctions." <u>Docket No. 78</u>. It is unclear to which motion Ms. Bonds was purporting to respond. By the time Ms. Bonds filed this "opposition," I had already granted in part Ms. Graham's motion for default judgment and had ordered discovery sanctions against Ms. Bonds as discussed above. *See* <u>Docket No. 72</u>.

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To prevail on her motion, a movant seeking summary judgment must first show "an absence of evidence to support the nonmoving party's case." *Pleasantdale Condos., LLC v. Wakefield*, 37 F.4th 728, 733 (1st Cir. 2022) (quoting *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir. 1989)). The burden then shifts to the nonmovant, who must establish the existence of a genuine issue of material fact by producing "evidence that would support a jury verdict" in the nonmovant's favor. *Anderson*, 477 U.S. at 256. A nonmovant's production of evidence that is "merely colorable" or "not significantly probative" will be inadequate to defeat a motion for summary judgment. *Id.* at 249–50. A nonmovant cannot avoid summary judgment merely by claiming that a material fact is disputed. *See Cherkaoui*, 877 F.3d at 24 ("[T]he nonmovant must provide sufficiently supported evidence, without relying 'upon mere allegation or denials of [the movant's] pleading,' to establish a genuine issue for trial." (second alteration in original) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993))). "A court will disregard 'conclusory allegations, improbable inferences, and unsupported speculation' in determining whether a genuine factual dispute exists." *Id.* (quoting *Sullivan v. City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009)).

In deciding a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor." *Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018).

### B.    *ERISA*

It is uncontested that the insurance policy at issue in this case is part of an ERISA-regulated plan, so the statutory and federal common law developed under ERISA governs the parties' conflicting claims. *See* Docket No. 1, ¶ 6 (stating, in part, that ERISA governs the relevant

employee welfare benefit plan); Docket No. 10, ¶ 6 (Ms. Bonds' answer admitting the allegation in paragraph 6); Docket No. 11, ¶ 6 (Ms. Graham's answer admitting the allegation in paragraph 6); *see also Forcier ex rel. Forcier v. Forcier*, 406 F. Supp. 2d 132, 139 (D. Mass. 2005) (stating that "[i]nsurance coverage which is part of an ERISA plan is regulated under ERISA" (alteration in original) (quoting *Wickman v. Nw. Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990))), *aff'd sub nom. Forcier v. Metro. Life Ins. Co.*, 469 F.3d 178 (1st Cir. 2006).

"Although it is a 'comprehensive and reticulated' statute, ERISA does not set forth a specific rule governing every issue that might arise in the administration and enforcement of rights under employee benefit plans." *Forcier*, 406 F. Supp. 2d at 139 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108 (1989)). "Where no specific provision under ERISA is applicable, courts must apply or create federal common law to resolve the dispute." *Id.* And "[w]here federal common law is silent or not fully formed with respect to an issue, it may be appropriate to borrow from state law principles in fashioning the federal common law." *Id.* at 140. "In so doing, the court does not directly apply state law." *Id.* "Rather, it considers whether common-sense state law principles serve 'the spirit of ERISA in promoting fair and equitable settlements of claims, as well as in promoting the formation of employee benefit plans.'" *Id.* (quoting *Wickman*, 908 F.2d at 1085).

## III.    Analysis

In her motion for summary judgment, Ms. Graham contends that there is no genuine dispute of material fact as to her entitlement to the proceeds of the policy. *See generally* Docket Nos. 73–75. In essence, she argues that she is contractually entitled to payment as the named beneficiary, and that Ms. Bonds has failed to point to any evidence that would permit a ruling in Ms. Bonds' favor. *See generally* Docket Nos. 73–75.

As set forth below, I consider the motion through two different lenses, although both point to the same result.

First, I weigh all the evidence that can be gleaned from the record that might be deemed to support Ms. Bonds' claims that Ms. Graham has committed fraud, or murder, and draw all reasonable inferences in Ms. Bonds' favor. Based on this searching review of the record,[8] it is evident that Ms. Bonds has failed to meet her burden under *Anderson* and its progeny to point to "evidence that would support a jury verdict" in her favor. *See* 477 U.S. at 256. There being no evidence that creates a genuine issue of material fact, I find that Ms. Graham is entitled to summary judgment.

Second, I briefly consider the summary judgment motion in light of my ruling imposing sanctions for Ms. Bonds' discovery violations, whereby Ms. Graham is permitted to draw reasonable adverse inferences with respect to the particular interrogatories that Ms. Bonds failed to answer and with respect to the requests for admission that Ms. Bonds failed to answer in a timely fashion. Although the summary judgment standard remains the same—such that all reasonable inferences must be drawn in favor of the non-moving party in deciding whether there is a genuine issue for trial—the evidence before the Court includes unfavorable imputed "responses" to the interrogatories and requests for admission. With these unfavorable "responses" in play, it is doubly clear that Ms. Graham is entitled to summary judgment.

---

[8] Under Local Rule 56.1, it should fall to the *parties*—not the Court—to identify evidence to support, or oppose, summary judgment. Ms. Bonds, however, has failed entirely on this score. Instead, I have "ferreted" it out of the parties' submissions in connection with previous discovery disputes. In this respect, Ms. Bonds has received an extra benefit of the doubt. *See McGrath v. Tavares*, 757 F.3d 20, 26 n.10 (1st Cir. 2014) (comparing "anti-ferreting rules" among districts in the First Circuit). Indeed, the most colorable evidence I have identified to support Ms. Bonds' position, which I discuss below, was not cited in her opposition to summary judgment.

### A.    The Parties' Positions

The parties offer diametrically opposed views of the case and its current posture:

As noted above, Ms. Graham's argument is straightforward. She relies on the facts that the policy provides that the insurance proceeds are to be paid to the named beneficiary, and that Lincoln's records reflect that Ms. Graham was designated as the primary beneficiary at the time of the Decedent's death. *See generally* <u>Docket No. 75</u>. There appears to be no dispute about these facts; indeed, they are evidenced by the documents attached to the Complaint. *See* <u>Docket No. 1-4, at 13</u> ("At an Insured Person's death, the amount of his or her Personal Life Insurance will be paid to the surviving Beneficiary."); <u>Docket No. 1-6</u> (document listing Ms. Graham as the primary beneficiary).

Ms. Bonds' claims, by contrast, are more elaborate. She contends that Ms. Graham should not be paid the insurance proceeds for two reasons. Ms. Bonds claims that: (1) Ms. Graham "fraudulently manipulated [the policy's] beneficiary designation," and (2) Ms. Graham was involved[9] in the Decedent's murder. *See* <u>Docket No. 77, at 2</u>–3. Therefore, Ms. Bonds claims, the insurance proceeds should be paid to her, not to Ms. Graham.

There is some force to Ms. Graham's contention that the controlling documents should dictate the outcome here. However, identification of a named beneficiary is not necessarily the end of the inquiry. The Court must consider whether there is other evidence that creates a genuine issue for trial. As another judge of this Court has noted:

> [F]ederal law does not limit inquiry in these matters to the four corners of an insurance policy. Although ERISA requires that the fiduciary shall make payments

---

[9] As discussed below, it is unclear what role Ms. Bonds alleges Ms. Graham played in the Decedent's murder. In Ms. Bonds' answer, she asserts that, "upon information and belief," Ms. Graham "murdered" the Decedent. <u>Docket No. 10</u>, ¶ 70. In her discovery responses, however, Ms. Bonds appears to merely claim that Ms. Graham "was present" when the Decedent died. <u>Docket No. 35-2, at 6</u>.

> to a beneficiary "designated by a participant, or by the terms of [the] plan", 29
> U.S.C. § 1002(8), it is silent as to how to select a beneficiary from among disputing
> claimants and the Court must look beyond the named beneficiary to determine
> which claimant should prevail.

*Prudential Ins. Co. of Am. v. Schmid*, 337 F. Supp. 2d 325, 328 (D. Mass. 2004) (second alteration

in original).

The Court must, in short, consider such evidence as Ms. Bonds may offer in support of her

fraud, and murder, claims.

### B. Even on a Searching Review of the Record, There Is Insufficient Evidence to Warrant a Trial on Ms. Bonds' Allegations.

I note at the outset that Ms. Bonds' opposition to Ms. Graham's summary judgment motion

is devoid of anything that might be considered evidence. Indeed, Ms. Bonds has failed to attach

any exhibits or other supporting documentation to her opposition to summary judgment. *See*

*generally* Docket No. 77. Ms. Bonds relies instead upon conclusory assertions that the

circumstances surrounding the beneficiary change are "suspicious" and "deeply troubling" and

that they warrant a "thorough examination" at trial. *See id.* at 2–3. Ms. Bonds ignores, however,

that the procedure for conducting such an examination in a federal case is *discovery*. Trial, by

contrast, is for resolving conflicts in evidence, not for casting about in hopes that some evidence

might emerge.

As numerous judges within this district have explained, the Court "has no independent

obligation to ferret out facts that might defeat a motion for summary judgment." *Yanovsky v.

JPMorgan Chase*, No. 13-11426-RGS, 2014 WL 2986655, at *3 n.4 (D. Mass. July 2, 2014) (citing

*Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 42 (1st Cir. 2006)); *see, e.g.*, *Endicott Constructors

Corp. v. E. Amanti & Sons, Inc.*, No. 14-cv-12807-LTS, 2017 WL 3028877, at *14 n.166 ("It is

not the Court's duty to scour the record in search of a genuine issue of triable fact."). Ms. Bonds'

abject failure to point to any evidentiary material is, by itself, sufficient grounds to allow summary

judgment over her opposition. Nonetheless, in considering Ms. Graham's summary judgment motion, I have scoured the docket for evidence that might arguably support Ms. Bonds' claims. I discuss below such "evidence" as I have been able to identify.

1.    *Ms. Bonds' Claim that Ms. Graham Fraudulently Changed the Beneficiary Designation*

Ms. Bonds first argues that Ms. Graham fraudulently designated herself as the primary beneficiary of the policy. Although Ms. Bonds does not herself point to any evidentiary material, I have identified some evidence that might arguably support Ms. Bonds' claims.

First, Ms. Bonds asserted in an interrogatory response that, in late 2021, her son told her that he wanted her (Ms. Bonds) to be the sole beneficiary of his life insurance policy so that she could take care of his children. If he had changed his mind, she says, he would have told her. Specifically, the interrogatory response states:

> In late 2021 My son talked to me about having a life insurance policy . My son told me specifically that he was putting me down as the sole beneficiary of the life insurance policy. My son told me he would be doing this because he wanted me to take of his children if anything ever happened to him if he were no longer here. At that time he did not have a great relationship with the mother of his children as they had an on going custody and child support dispute. To insure that they would always have something he told me he would list me on the policy. There was never any mention about any other persons being on the policy until my son passed away. . . . As I looked at the date on the changes to the policy I know my son never told me about this change and the plan was always to have this policy for his children. My son was only dating Carshan Graham for about 2 years more or less and they do not have any children together. Even if my son changed his mind I know he would inform me before doing so and he did not.

Docket No. 35-2, at 5.

Second, Ms. Bonds attested, in a sworn affidavit filed in opposition to one of Ms. Graham's motions to compel, that her son had difficulty using computers, making it "highly unlikely" that he was the one who submitted the change of beneficiary electronically: "I know my son cannot use a computer and regularly needs assistance, and a change to the form electronic is highly

unlikely." <u>Docket 35-1</u>, ¶ 6. In the same interrogatory response partially quoted above, Ms. Bonds similarly stated:

> I was then forwarded a packet from the insurance agency indicated that there was original signature and then an amendment or change to the policy that was done electronically. I know my son very well and he barely knew how to use a computer and would always do important things in writing by hand as he did with the original signature on the policy.

<u>Docket No. 35-2, at 5</u>.

Leaving aside questions of admissibility, this evidence supports a finding that the Decedent *at some point* wanted his mother to be the primary beneficiary. The relevant time period, however, would presumably run from January 2021, when the Decedent originally designated his mother as the primary beneficiary, through "late 2021," when the Decedent purportedly told his mother that he wanted her to take care of his children in the event of his passing. *See generally Phx. Mut. Life Ins. Co. v. Adams*, <u>30 F.3d 554, 566</u> (4th Ci<u>r. 1994</u>) (noting admissibility under Federal Rule of Evidence 803(3) of a decedent's statements regarding his or her mental state at the relevant time).

Evidence about what the Decedent may have intended in "late 2021" says little about the key question before the Court, which concerns the validity of a particular document, the January 1, 2022, change of beneficiary form. On its face, the form reflects that—at some point—the Decedent changed his mind about who he wanted to name as the primary beneficiary. Ms. Bonds' contention that the Decedent said something to her in "late 2021" that was consistent with the original primary beneficiary designation suggests that the Decedent's change of mind occurred after that point—in other words, shortly before the beneficiary change was recorded on January 1, 2022. This is unremarkable; indeed, one would ordinarily expect that an insured would update his

or her beneficiary designation shortly after deciding to do so.[10] Without considerably more, evidence about the Decedent's statement regarding his intention as of "late 2021" is insufficient to permit any reasonable finder of fact to conclude that the Decedent did not actually name Ms. Graham as his primary beneficiary on January 1, 2022.[11]

For good reason, the courts are skeptical when parol evidence is aimed at contradicting a controlling document. In this regard, it is instructive to compare the situation here with the factual scenario in *Prudential Insurance Co. of America v. Schmid*, which in many ways involved the converse of the situation here. In *Schmid*, the insured made an unequivocal statement of his present and immediate intention to change a beneficiary designation. *See* 337 F. Supp. 2d at 327, 329–30. Specifically, the insured in *Schmid* actually called the insurance company and made clear that he wanted to change his beneficiary designation, but the insurance paperwork was never updated to reflect that change. *See id.* at 327, 330. Ultimately, the documents, not the phone call, controlled the outcome. *See id.* at 330–31. Although there was no question that the expression of a present intention to change the beneficiary occurred at the relevant time, that evidence was insufficient to create a triable issue for purposes of challenging the rights of the beneficiary named in the relevant document. *See id.*

Here, the fact that Ms. Graham is named in the insurance records as the primary beneficiary is powerful evidence, even if it is not conclusive. At the very least, any attempt to challenge this

---

[10] By contrast, a full 10 months elapsed between the change of beneficiary and the Decedent's death. While a change of beneficiary that is recorded shortly before the death of an insured is a circumstance that may warrant attention, that is not the situation here.

[11] There is nothing in the record to indicate whether the Decedent would have received, in due course, a notice or confirmation of the beneficiary change. Nor is there anything in the record to suggest that anyone took steps to prevent the Decedent from learning about the change. In other words, there is no evidence here to suggest that anyone made an effort to hide the change of beneficiary from the Decedent.

written designation of primary beneficiary based on an oral expression of contrary intent would need to pertain to the date when the designation was made (although *Schmid* indicates even *that* might not suffice). Otherwise, the most that can be inferred is that the Decedent changed his mind sometime before or around January 1, 2022, which is precisely what the insurance records reflect.

To be sure, Ms. Bonds claims that if her son had changed his mind, he would have told her so, and he never did. And she couples this claim with her assertion that the Decedent was not computer savvy and always did important things by hand.[12] But—considered alone or in combination with the other "evidence" I have gleaned to support Ms. Bonds' claim—this is insufficient to meet her burden at the summary judgment stage. Leaving aside possible evidentiary challenges to admitting such testimony,[13] there simply is not enough here to make out a triable claim. Taken at face value, Ms. Bonds' statements tend only to show that she was surprised to learn that her son changed his mind without telling her and that someone may have assisted him in changing the beneficiary designation. Neither of these points is sufficient to create a foundation

---

[12] Ms. Bonds notes, for example, that the Decedent completed the beneficiary designation form by hand when he made *her* the primary beneficiary in January 2021. *See* Docket No. 35-2, at 5 ("I know my son very well and he barely knew how to use a computer and would always do important things in writing by hand *as he did with the original signature on the policy*" (emphasis added)); *see also* Docket No. 1-5 (hand-written beneficiary designation form).

[13] It is difficult to imagine a non-speculative evidentiary foundation for admitting testimony about Ms. Bonds' supposition that her son "would have" told her if he changed his mind. As for the Decedent's lack of computer savviness, it is impossible to determine on this record whether such testimony might be admissible as reflecting a "habit." *See* Fed. R. Evid. 406 ("Evidence of a person's habit . . . may be admitted to prove that on a particular occasion the person . . . acted in accordance with the habit . . . ."). A proponent of such evidence would need to demonstrate that the conduct occurred in "instances 'numerous enough to [support] an inference of systematic conduct and to establish one's regular response to a repeated specific situation.'" *United States v. Newman*, 982 F.2d 665, 668 (1st Cir. 1992) (alteration in original) (quoting *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 511 (4th Cir. 1977)).

upon which any reasonable finder of fact could conclude that the document designating Ms. Graham as primary beneficiary was the product of fraud.

I note that, faced with a somewhat similar claim, a district judge in Georgia reached the same conclusion and succinctly noted that "evidence of family tensions" and the "statements of friends and acquaintances that, in their opinion, decedent would not have changed her insurance policy to exclude [certain family members]" were "insufficient to support a finding that the . . . Change of Beneficiary [was] invalid." *Unum Life Ins. Co. of Am. v. McCall*, No. 08-cv-1529, 2010 WL 11508302, at *5 (N.D. Ga. Feb. 11, 2010) (citing Georgia law).

There is, in short, insufficient evidence to permit a reasonable finder of fact to conclude that the document identifying Ms. Graham as the primary beneficiary was created by fraudulent means.

### 2.    *Ms. Bonds' Claim that Ms. Graham Murdered the Decedent*

Ms. Bonds' next argument is that Ms. Graham killed the Decedent and, therefore, that she should not be able to collect on the policy. Although neither party has briefed the point, I will assume that Ms. Graham would be prohibited from receiving the proceeds of the life insurance policy if she were responsible for the Decedent's death.[14]

As with her claim that Ms. Graham fraudulently changed the primary beneficiary, Ms. Bonds' opposition to the summary judgment motion cites no evidence to support her contention that Ms. Graham killed the Decedent. After reviewing the entirety of the docket, the only evidence

---

[14] Whether the matter is viewed under federal common law, under ERISA, or by analogy to Massachusetts law, the outcome is the same. *See Admin. Comm. for the H.E.B. Inv. & Ret. Plan v. Harris*, 217 F. Supp. 2d 759, 761 (E.D. Tx. 2002) ("It has long been a principle of federal common law that . . . killers should not be rewarded with insurance benefits for taking a life." (citing *Mut. Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886))); *Slocum v. Metro. Life Ins. Co.*, 245 Mass. 565, 567 (1923) ("It would be contrary to public policy to permit a beneficiary who has feloniously taken the life of the insured to recover on the policy.").

I have been able to identify that might bear on the point is in one of Ms. Bonds' interrogatory responses. That response reads in full:

> Prior to the day that my son was murdered I knew that Carshana and the mother of his child her were having issues. I do not know what the particular issues were but I knew that they did not get along. July 29, 2022 the plan was for Carshana and her children to go with him to pick up his children. Carshana was present with her children and other witnesses that saw my son get murdered.[15] After I received notice policy change, I received a call by the detective that is working on my son's case that he wanted to speak with me. I thought it was about my son's case but it was about Carshana and the insurance policy. I was asked about the insurance policy by the detectives in connection with his death which is leading me to believe that the two may be connected.

Docket No. 35-2, at 6.

In sum, the only evidence in support of Ms. Bonds' assertion that Ms. Graham killed the Decedent is that (presumably at the time of his death) Ms. Graham and the mother of the Decedent's child(ren) were "having issues"; that Ms. Graham "was present" when the Decedent was killed; and that, during a single telephone conversation, a detective asked Ms. Bonds about the policy and about Ms. Graham. *See id.* This is wholly insufficient to meet Ms. Bonds' burden under *Anderson* and its progeny to produce "evidence that would support a jury verdict" in Ms. Bonds' favor. *See* 477 U.S. at 256.

Even assuming the conversation with the detective was precisely as Ms. Bonds describes it, no reasonable factfinder could find on such evidence that Ms. Graham killed the Decedent. Indeed, Ms. Bonds' description of the telephone conversation does not even support a finding that the police suspected Ms. Graham. The most that can be inferred from this statement is what Ms. Bonds acknowledges in the last sentence of her interrogatory response: that the conversation with

---

[15] It is not clear from the docket what significance this reference to "July 29, 2022," may have. As indicated above, the Decedent was killed on November 9, 2022. Docket No. 1, ¶ 15; *see* Docket No. 1-7 (death certificate).

the detective gave *Ms. Bonds* the idea that "the two may be connected." *See* <u>Docket No. 35-2, at</u>

<u>6.</u>

There is an assertion in Ms. Bonds' opposition to the summary judgment motion that Ms. Graham "has not been exonerated as a suspect in th[e] ongoing homicide investigation." <u>Docket No. 77, at 2</u>. But this naked assertion of counsel adds nothing to the scales. Ms. Bonds has not pointed to *any* evidence that Ms. Graham is (or ever was) a suspect in the Decedent's murder.[16] Moreover, even if Ms. Graham *were* a suspect in the murder investigation, that alone would be insufficient to stave off summary judgment. *See Old Line Life Ins. Co v. Brooks*, No. 05-cv-722, <u>2007 WL 892448</u>, at *5 (S.D. Miss. Ma<u>r. 22, 2007</u>) ("Even if police detectives still suspected Amanda of complicity in her father's death, such 'evidence' would fail to create a genuine issue of fact as to whether Amanda wilfully caused or procured her father's death. . . . Absent admissible evidence showing Amanda was involved in her father's death, there is no reason for this Court to upset the normal operation of [the insured's] beneficiary designation.").

Ms. Bonds is, unsurprisingly, not the first person to attempt to challenge the distribution of life insurance proceeds by claiming that the beneficiary was involved in the insured's death. As an

---

[16] As a matter of inference, it does not appear that Ms. Graham is currently a suspect, if she ever was one. During the hearing on Ms. Graham's summary judgment motion, I asked counsel for Ms. Graham to submit to the Court any evidence to support Ms. Graham's prior assertion in a status report to the Court that other individuals had been charged with the Decedent's murder. *See* <u>Docket No. 39, at 3</u> ("[T]he Boston Police have arrested and charged two individuals in connection with Mr. Pinckney's murder."). Later that day, counsel for Ms. Graham emailed my Deputy Clerk the following, in relevant part, copying counsel for Ms. Bonds:

> Per the court's request made in court today, Nicholas Carle, Suffolk Superior Court No.2384CR554, is charged with the murder of Elijah J. Pinckney. Mr. Carle is currently incarcerated awaiting trial on an unrelated charge of being a felon in possession of ammunition. Fantazia Latrina Royster, Suffolk Superior Court No.2384CR548, is charged with being an accessory after the fact in Mr. Pinckney's murder. She is awaiting trial but is on the street.

I directed the Deputy Clerk to docket this email. *See* <u>Docket No. 82</u>.

Indiana court noted when faced with just such a claim, the plaintiff "failed to demonstrate that there is any genuine issue of material fact to be resolved by a jury" where the plaintiff "proffer[ed] no actual evidence that [the defendant] was involved in the murder of [the insured]" and instead contended "that a reasonable jury could infer [the defendant's] complicity from . . . allegedly suspicious circumstances surrounding th[e] death." *Kontos v. Kontos*, 968 F. Supp. 400, 403, 409 (S.D. Ind. 1997).

> **C.    *The Lack of Evidence to Support Ms. Bonds' Claims Is Even Clearer Given My Prior Order of Sanctions.***

The dearth of evidence to support Ms. Bonds' claims is even starker when the record is considered in light of the sanctions imposed on Ms. Bonds for her discovery failures. As noted above, I have ruled that Ms. Graham "may draw reasonable inferences as to [the unanswered second set of] interrogatories" and may treat the unanswered requests for admission as admitted. *See* Docket No. 72.

In Request for Admission 12, Ms. Graham asked Ms. Bonds to admit (or deny) that Ms. Bonds "has no facts or evidence to support her allegation that [Ms. Graham] fraudulently made herself the primary beneficiary under the subject Policy." Docket No. 70, at 6. And in Request for Admission 9, Ms. Graham asked Ms. Bonds to admit (or deny) that she "has no facts or evidence to support her allegation that [Ms. Graham] murdered [the Decedent]." *Id.* at 5. Assuming, as I may, that Ms. Bonds has admitted that she has no evidence whatsoever to support her claims that Ms. Graham fraudulently changed the primary beneficiary of the policy, or to support her claim that Ms. Graham killed the Decedent, there can be no question that Ms. Graham is entitled to summary judgment.

If more were needed, in Ms. Graham's second set of interrogatories, she asked Ms. Bonds about the witnesses she intends to call at trial. *See* Docket No. 75, at 2–3 (listing the

interrogatories). Ms. Graham argues that it is reasonable to infer from Ms. Bonds' failure to respond to these interrogatories that Ms. Bonds "intends to call no witnesses, including experts, at trial." *Id.* at 4–5. Ms. Graham's proposed inference is entirely reasonable. An inference that Ms. Bonds intends to offer no witness or expert testimony at trial further supports finding for Ms. Graham on her summary judgment motion.

### D.    *Ms. Bonds' Crossclaims*

Having resolved the question of entitlement to the insurance proceeds, I turn briefly to the remaining claims at issue in Ms. Graham's summary judgment motion, namely Ms. Graham's request for summary judgment on Ms. Bonds' crossclaims.

The crossclaims are the twins of Ms. Bonds' claims for the insurance proceeds. First, Ms. Bonds alleges that Ms. Graham committed fraud by changing the primary beneficiary of the policy from Ms. Bonds to herself without the Decedent's knowledge or consent. *See* Docket No. 10, ¶¶ 58–68. Second, Ms. Bonds claims that Ms. Graham should be found liable under Massachusetts' wrongful death statute for the murder of the Decedent.[17] *See id.* ¶¶ 69–74.

Although Ms. Graham's summary judgment motion and supporting papers do not explicitly separate the crossclaims from the rest of the case, her memorandum in support of her motion expressly refers to the crossclaims filed against her. *See* Docket No. 75, at 2 ("Defendant Bonds' allegation of fraud and the murder of Mr. Pinckney as stated in her Crossclaim are based upon 'information and belief.'"). Ms. Graham also argues generally that "there exists no genuine

---

[17] Specifically, Ms. Bonds claims that Ms. Graham "should be found liable pursuant under the Massachusetts wrongful death statute M.G.L. c 299 s. 1 et seq for the conscious pain and suffering as suffered by Aretha Bonds" and "should be found liable for Gross Negligence pursuant to Massachusetts wrongful death statute M.G.L. c 299 s. 1 et seq." Docket No. 10, ¶¶ 72, 74.

issue of material facts *in this case*." *Id.* at 6 (emphasis added). Ms. Graham's papers are, therefore, sufficient to put the whole case, including the crossclaims, in play.

The record reflects that Ms. Bonds fully understood that the present summary judgment motion encompassed Ms. Bonds' crossclaims.[18] This is evident from the document captioned "Aretha Bonds Opposition to Carshana Graham's Motion for Sanctions" (Docket No. 78), which Ms. Bonds submitted on the same day that she filed her opposition to Ms. Graham's summary judgment motion. Among other assertions, that "Opposition" recites that: (1) Ms. Bonds "filed her crossclaim only after conducting a thorough and reasonable inquiry into the facts surrounding the disputed life insurance policy and the highly suspicious circumstances surrounding the Decedent's death"; (2) Ms. Bonds' "allegations of fraud and wrongful conduct by Ms. Graham were made based on credible information"; and (3) "[t]he crossclaim was meticulously crafted to meet [the] requirements" of Federal Rule of Civil Procedure 9(b). Docket No. 78, at 1–2.

I recommend that the Court grant summary judgment in favor of Ms. Graham on the crossclaims as well. The determination that there is no genuine dispute of material fact as to whether Ms. Graham fraudulently changed the beneficiary designation necessarily disposes of the

---

[18] In any event, district courts may enter judgment sua sponte at the summary judgment stage so long as (1) "discovery is sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts" and (2) the court gave "the targeted party appropriate notice and a chance to present its evidence on the essential elements of the claim or defense." *Redondo Const. Corp. v. Izquierdo*, 746 F.3d 21, 29 (1st Cir. 2014) (quoting *Berkovitz v. Home Box Off., Inc.*, 89 F.3d 24, 29 (1st Cir. 1996)). Here, discovery has been closed for several months, and Ms. Bonds had the opportunity to present evidence to support her fraud and murder claims in her opposition to Ms. Graham's summary judgment motion. Indeed, her opposition asserts generally that "[a] reasonable jury, upon reviewing the evidence, could certainly find that [Ms.] Graham engaged in fraudulent conduct," as well as that "[t]he existence of genuine issues of material fact" surrounding "the highly suspicious beneficiary change and the ongoing homicide investigation[] mandates that this matter proceed to trial." Docket No. 77, at 3–4. It also bears noting that Ms. Bonds had an additional opportunity to present her evidence at the summary judgment hearing; instead, her counsel failed to appear.

fraud crossclaim. Likewise, the determination that there is no genuine dispute of material fact as to whether Ms. Graham was responsible for the Decedent's death necessarily disposes of Ms. Bonds' crossclaims under Massachusetts' wrongful death statute. Accordingly, the entire case can be resolved on the present summary judgment motion.

<u>CONCLUSION</u>

For the reasons detailed above, I RECOMMEND that the Court GRANT Ms. Graham's motion for summary judgment (<u>Docket No. 73</u>) and direct the Clerk of Court to release the funds held by the Court to Ms. Graham.

/s/ Paul G. Levenson
Paul G. Levenson
Dated: January 23, 2025               U.S. MAGISTRATE JUDGE

<u>NOTICE OF OBJECTION PROCEDURE</u>

The parties are advised that under the provisions of <u>Federal Rule of Civil Procedure 72(b)</u>, any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health & Human Servs.*, <u>848 F.2d 271</u> (1st Ci<u>r. 1988</u>); *United States v. Valencia-Copete*, <u>792 F.2d 4</u> (1st Ci<u>r. 1986</u>); *Scott v. Schweiker*, <u>702 F.2d 13, 14</u> (1st Ci<u>r. 1983</u>); *United States v. Vega*, <u>678 F.2d 376, 378</u>–79 (1st Ci<u>r. 1982</u>); *Park Motor Mart, Inc. v. Ford Motor Co.*, <u>616 F.2d 603</u> (1st Ci<u>r. 1980</u>); *see also Thomas v. Arn*, <u>474 U.S. 140</u> (1985).